# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LLOYD JOHNSON,
          Plaintiff,

v.                                                                             Case No. 14-C-1408

KAREN RIMMER et al.,
          Defendants.

## DECISION AND ORDER

In 2012, plaintiff Lloyd Johnson was involuntarily committed for inpatient psychiatric treatment through the Behavioral Health Division (BHD) of the Milwaukee County Department of Health and Human Services (DHHS). Johnson was treated at the Milwaukee County Mental Health Complex (MHC), and while there, obtained a scissors and used it to sever his penis. He brings this suit under 42 U.S.C. § 1983 against various MHC officials and employees, Milwaukee County, DHHS, and MHC alleging personal and municipal liability for deprivations of his Fourteenth Amendment rights. He also alleges violations of state constitutional, statutory, and common law. Defendants move for summary judgment on Johnson's federal claims and ask that, if summary judgment is granted, I decline to exercise jurisdiction over his state claims.

## I. BACKGROUND

Johnson started suffering from mental illness, including paranoid schizophrenia and recurrent depression, in 2011, though he has had obsessive thoughts about his genitals since childhood. Johnson was voluntarily admitted or involuntarily committed to MHC from July 8 to July 10, 2011, with complaints of paranoia and auditory

hallucinations; from July 23 to July 24, 2011, due to suicidal statements; and from February 28 to February 29, 2012, with complaints of depression and suicidal thoughts.

On March 3, 2012, while staying at his step-mother's house, Johnson used a scissors to cut off his testicles, earlobes, and a portion of the skin on his penis. Johnson was admitted to Froedtert Hospital in Milwaukee County. His wounds required daily care, including regular dressing (bandage) changes.

On March 8, Johnson was involuntarily admitted to MHC under a petition for emergency detention. *See* Wis. Stat. § 51.15. He was transferred from Froedtert to MHC the next morning and assigned a private room with a bathroom on MHC's Intensive Treatment Unit (ITU), an inpatient unit where high-risk patients are treated. Johnson was placed on a one-to-one observation status (or simply, "1:1"). Patients on 1:1 are continuously watched by a member of MHC's nursing staff, even when they are asleep or using the bathroom.

On March 9, defendant David Macherey, a psychologist and ITU's treatment director, saw Johnson for an initial assessment. Macherey determined that Johnson was experiencing delusional thoughts, auditory hallucinations, poor sleep, difficulty with concentration and attention, poor self-esteem, and impaired judgment. He concluded that Johnson was at significant risk for self-harm. Defendant Thomas Harding, a psychiatrist and MHC's medical director, also saw Johnson that day. Macherey and Harding decided to keep Johnson on 1:1. Harding prescribed Johnson medication, including Zyprexa, an antipsychotic used to treat conditions like schizophrenia and bipolar disorder, and Ativan, an antianxiety drug.

2
Case 2:14-cv-01408-LA   Filed 01/18/18   Page 2 of 16   Document 88

On March 12, Macherey assessed Johnson again. He noted that Johnson showed no insight into the dangerousness of his behavior and should remain on 1:1. On March 13, Macherey again assessed Johnson. Macherey noted that Johnson's affect was brighter, his thinking was increasingly organized, and he expressed disappointment in himself for acting on his thoughts of self-harm. However, Macherey also noted that Johnson was still having intermittent thoughts about cutting off his genitals. Macherey kept Johnson on 1:1. That day, the petition for Johnson's emergency detention was withdrawn, and Johnson signed an application for voluntary admission to MHC, which Macherey approved. On March 14, Macherey learned that Johnson had said that morning that he was still thinking about "finishing the job" (that is, further mutilating his genitals). Due to Johnson's statement, Macherey kept him on 1:1. That evening, Johnson told a nurse that his medications were not helping him but declined to answer her questions about whether he was having auditory hallucinations.

On March 15, Johnson met with his entire treatment team, including Macherey and Harding, a registered nurse named Mary Holtz, a psychiatric social worker named Candace Coates, and an occupational therapist named Sue Erato.[1] Johnson was noted as cooperative with his treatment, he said that his medications were helpful and that his auditory hallucinations had become "cloudy" and less troublesome, and he denied having had thoughts of self-harm since the day before. Harding observed that Johnson seemed to be doing better and was future-oriented and noted that Johnson articulated a desire for therapy to address his self-esteem issues, denied suicidal ideations, was able to articulate personal strengths and goals, and was sleeping better, though he also found that Johnson's thoughts were still somewhat disorganized. Holtz noted that

---

[1] Holtz, Coates, and Erato are not defendants.

3
Case 2:14-cv-01408-LA    Filed 01/18/18    Page 3 of 16    Document 88

Johnson had expressed disbelief to her about what he had done to himself on March 3 and stated that Johnson was still reporting "bizarre thoughts" as of that day but that he also said that he was experiencing far less "background noise," his thinking was "not so cloudy," and he was not having any thoughts of self-harm or suicide.

On March 16, Macherey again assessed Johnson. Macherey noted that Johnson remained depressed but that he continued to deny any suicidal ideation or thoughts of self-harm. Macherey observed what he believed to be a consistent decrease in Johnson's symptoms and overall improvement of his mental condition. Holtz, who cared for Johnson that day, noted that Johnson was feeling depressed about the harm that he had done to himself and overwhelmed at the extent of his medical problems but that he stated that his thoughts were reality-based and that he was not having any thoughts of self-harm. Macherey believed that Johnson's concerns about the extent of his medical problems indicated improvement in his condition. He felt that Johnson had demonstrated sufficient improvement in his condition to show that he no longer needed 1:1. The other members of Johnson's treatment team agreed. That afternoon, Macherey ordered Johnson to be removed from 1:1. From that point, Johnson was not constantly monitored but instead was subject to checks by ITU staff every 15–30 minutes.

Neither Macherey nor Harding saw Johnson over the weekend of March 17–18, 2012, but the registered nurses assigned to care for him documented his mood, behavior, and condition. That Friday, Paul Saeger (who is not a defendant) noted no unsafe behavior. That Saturday, defendant Ade George noted that Johnson denied any suicidal ideation or need to mutilate his genitals and that she did not observe any self-harm or other behavioral issues, defendant Remedios Azcueta noted that Johnson was

4
Case 2:14-cv-01408-LA    Filed 01/18/18    Page 4 of 16    Document 88

depressed and his mood was blunted, and defendant Leslie Roberts noted that his mood was pleasant early in her shift but that he was tearful and anxious later on.

That Sunday, March 18, George noted that Johnson's affect was flat but better than the day before and that Johnson continued to express regret about the harm he had caused himself. She also noted that Johnson denied having any auditory hallucinations, suicidal ideation, or thoughts of self-harm. Defendant Rebecca Brame (now Rebecca Hoey) noted that she spoke with Johnson, who talked about basketball and his mother and indicated that he could not go home because his mother was afraid of him. About their conversation, Hoey also wrote, "Regrets. 'I can't have thoughts like this. It's not good for me.'" *See* Hoey Dep., ECF No. 69-8, at 41:20–42:3.

Azcueta was assigned to care for Johnson starting at 2:45 that afternoon. During the first hour of her shift, Azcueta went to Johnson's room to check in on him at least twice. He was in bed both times but said that he was "okay" and "fine," when asked. Around 3:45, Johnson was in bed with his eyes closed, but Azcueta entered his room and asked him how he was. Johnson opened his eyes but did not respond. She checked his bathroom and the surrounding area but did not see anything unusual. During that shift, defendant Nii Adamah, a certified nursing assistant, was assigned to monitor the "zone" within the ITU that included Johnson's room and documented Johnson's location at 15-minute intervals throughout the shift.

At 4:00, Johnson approached the ITU's nursing station, bleeding, holding a scissors and his severed penis. Staff called for an emergency response team and paramedics, who transferred Johnson back to Froedtert, where his penis was surgically reattached.

5
Case 2:14-cv-01408-LA    Filed 01/18/18    Page 5 of 16    Document 88

MHC officials conducted a root cause analysis and found that "the exact circumstances of how [Johnson] obtained the scissors could not be determined." *See* ECF No. 78-2, at 8. The written report from that investigation notes that "[Johnson] stated after the event that he 'found' the scissors in his bathroom [but] had no idea how they got there." *Id.* at 9. Johnson said much the same thing during his deposition in this case, testifying that right before he harmed himself, he "found some scissors . . . [u]nder a pair of dry . . . hand towel napkins" in his "[b]athroom" but that he did not know how long they had been there, how they got there, or who left them there. Johnson Dep., ECF No. 69-1, at 65:3–:9, 91:17–92:1.

## II. DISCUSSION

Defendants move for summary judgment on Johnson's constitutional claims under § 1983 arguing that he cannot show that "he was deprived of a right secured by the Constitution . . . of the United States." *See Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). I must grant a party's motion for summary judgment on "each claim . . . on which summary judgment is sought," "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### A. Reasonable Care and Safety

Johnson argues that defendants deprived him of his rights under the Fourteenth Amendment when they removed him from 1:1, allowed him access to scissors, and

6

failed to properly verify his safety and the safety of his environment. "When a state actor such as Milwaukee County deprives a person of his ability to care for himself by . . . involuntarily committing him, it assumes an obligation to provide some minimum level of well-being and safety." *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 987 (7th Cir. 1998). Thus, state actors must provide "conditions of reasonable care and safety" for "the involuntarily committed." *Youngberg v. Romeo*, 457 U.S. 307, 321, 324 (1982).

As an initial matter, defendants argue that Johnson was not entitled to conditions of reasonable care and safety under the Fourteenth Amendment when he harmed himself because he was voluntarily admitted, not involuntarily committed, at the time. Johnson argues, to the contrary, that due to his mental illness and condition, he was a "de facto involuntary patient," despite his formal status. I need not address this dispute because, as discussed below, Johnson cannot show that he suffered a constitutional deprivation under the Fourteenth Amendment, even if he was involuntarily committed.

**1. Removal from 1:1**

Johnson argues that a reasonable jury could find that the decision to remove him from 1:1 violated the Fourteenth Amendment, but I disagree. When an appropriate professional makes a decision about the treatment or conditions of confinement of an involuntarily committed patient, the professional "is entitled to deference . . . unless 'no minimally competent professional'" would have made the same decision under the circumstances. *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon*, 163 F.3d at 988). A professional's decision is unconstitutional "only if it is such 'a substantial departure from accepted professional judgment, practice or standards as to

demonstrate' that it was not, in fact, based on professional judgment." *Lane v. Williams*, 689 F.3d 879, 882 (7th Cir. 2012) (quoting *Youngberg*, 457 U.S. at 323).

Here, a team of mental-health professionals—including a psychologist, a psychiatrist, a registered nurse, a psychiatric social worker, and an occupational therapist—agreed that it was appropriate to remove Johnson from 1:1 after a week of observation and treatment. Johnson does not dispute that the decision to remove him from 1:1 was "made by . . . appropriate professional[s]," *id.*, but he does dispute whether their decision was a legitimate exercise of professional judgment.

First, Johnson argues that he was removed from 1:1 due to budgetary and staffing concerns, rather than for legitimate clinical reasons. No reasonable jury could infer that from the available evidence, though, as Johnson offers nothing in support of this argument but unsubstantiated rumors and inadmissible hearsay. *See, e.g.*, ECF No. 85, Defs.' Resp. to Pl.'s Proposed Findings of Fact, ¶ 47. Moreover, administrative factors, including "convenience and cost," are "*permissible factors* . . . to consider in making treatment decisions," as long as they are not "considered *to the exclusion of reasonable medical judgment*." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011). Nothing here suggests that the decision to remove Johnson from 1:1 was made to the exclusion of reasonable medical judgment.

Second, Johnson argues that the decision was a substantial departure from accepted professional judgment, practice, or standards. But the record does not support such a conclusion. At most, a reasonable jury could agree with Johnson's proffered expert witness, Dr. Mitchell Dunn, that the decision was negligent under the circumstances. *See* Dunn Report, ECF No. 60-1, at 5–7. Professional negligence is, by

definition, a departure from accepted professional practice or standards. *See, e.g.*, *Medical Malpractice*, *in* Black's Law Dictionary (10th ed. 2014). But mere negligence is not a substantial enough departure to render a professional's decision unconstitutional. Rather, liability under the Fourteenth Amendment requires deliberate indifference, "essentially a criminal recklessness standard, that is, ignoring a known risk." *See Collignon*, 163 F.3d at 988. Nothing here suggests deliberate indifference.

For the foregoing reasons, no reasonable jury could find defendants liable under § 1983 for removing Johnson from 1:1. Therefore, I will grant their motion for summary judgment on Johnson's claim that the decision violated the Fourteenth Amendment.

**2. Access to Scissors**

Johnson next argues that a reasonable jury could find that a nurse left scissors in his bathroom in violation of the Fourteenth Amendment. Johnson's argument reduces to the following: the scissors he used must have come from somewhere, nurses on the ITU have access to scissors, some nurses used scissors when changing dressings, and some nurses changed Johnson's dressing in his bathroom, so a nurse probably left the scissors in his bathroom after using them to change his dressing. He argues that George, Azcueta, and a nurse practitioner named Barbara Plum (who is not a defendant) are the most likely culprits.

Johnson's argument fails for several reasons. First, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). Second, to prevail on a claim under § 1983, a plaintiff must show that each defendant was personally responsible for the claimed constitutional deprivation. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017). That one of three

9

individuals (only two of whom are defendants) may have left scissors in Johnson's bathroom is not enough to establish individual liability. Third, even if one of these defendants did leave scissors in Johnson's bathroom, he hasn't shown that her conduct was anything more than negligent. As stated above, the Fourteenth Amendment "is violated by acts or omissions that exhibit deliberate indifference; mere negligence is insufficient." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017).

For the foregoing reasons, no reasonable jury could find defendants liable under § 1983 for leaving scissors in Johnson's bathroom. Therefore, I will grant their motion for summary judgment on Johnson's claim that defendants allowed him access to scissors in violation of the Fourteenth Amendment.

### 3. Patient and Environmental Safety Checks

Johnson also argues that a reasonable jury could find that defendants failed, in violation of the Fourteenth Amendment, to either perform adequate safety checks or to properly search his room for contraband. At the time, BHD policy provided for three basic types of "rounds," during which staff were to perform such checks. First, at the beginning of each shift, a licensed nurse was required to "participate in . . . change of shift rounds," which included personally verifying "the whereabouts and well-being of each patient" and checking that each patient room and bathroom, among other areas, was "safe and orderly." *See* ECF No. 70-1, at 1. Second, every 15 minutes throughout each shift (but every 30 minutes during night shifts), staff were required to conduct rounds, verifying the location and well-being of each patient and documenting each patient's whereabouts. *Id.* at 1–2. Third, twice per shift at specified times, staff were

required to conduct "environmental safety rounds," which included "checking unit bathrooms, bedrooms and showers for safety." ECF No. 70-2, at 5.

The record suggests that staff conducted their rounds, as relevant to Johnson's claims, before he harmed himself. Azcueta testified during her deposition that she personally verified Johnson's whereabouts and well-being at least 3 times during the first hour of her shift on March 18, 2012—including at 3:45 p.m., no more than 15 minutes before he harmed himself—and that she checked his bathroom but did not find anything unusual there. *See* Azcueta Dep., ECF No. 79-7, at 23:18–:23, 29:2–:4. The record also contains Adamah's documentation of Johnson's whereabouts at 15-minute intervals throughout that shift. *See* ECF No. 70-13.

Johnson argues that Azcueta did not conduct her rounds on March 18, 2012, citing Rimmer's deposition testimony that "the nurse didn't do her rounds." Rimmer Dep., ECF No. 79-5, at 36:3. But this vague testimony does not clearly refer to Azcueta or specify what "rounds" she supposedly did not do. Moreover, Johnson concedes that Azcueta personally checked on him at 3:45 p.m. on March 18, 2012, shortly before he harmed himself. *See* Pl.'s Proposed Findings of Fact, ECF No. 77, ¶ 54.

Johnson also broadly disputes that staff conducted rounds as required, citing the report of the root cause analysis of the incident, which found that, despite facility policies about rounds and checks, "[i]nterviews with staff . . . suggested that while" they may document that they completed checks, "the checks are not always done." *See* ECF No. 78-2, at 9. Without more, there is no way to know whether or to what extent this finding is relevant to Johnson's claims. And, as discussed above, personal liability under § 1983 requires proof of individual misconduct, not the mere possibility of misconduct.

Even assuming Azcueta, Adamah, or others failed to conduct checks that could have prevented Johnson's injuries, he hasn't shown anything more than negligence. Again, liability under the Fourteenth Amendment requires more than mere negligence. *Aguilar*, 861 F.3d at 633.

No reasonable jury could find defendants liable under § 1983 for failing, in violation of the Fourteenth Amendment, to either perform adequate safety checks or to properly search Johnson's room for contraband. Therefore, I will grant their motion for summary judgment on his claim that they failed to properly verify his safety and the safety of his environment.

## B. Official Investigation and Root Cause Analysis

Johnson argues that defendants conspired to cover up the truth about what happened to him and why by conducting a "sham" investigation. Federal law "imposes liability on two or more persons who 'conspire . . . for the purpose of depriving . . . any person'" of his or her federal rights. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (omissions in original) (quoting 42 U.S.C. § 1985(3)).

Yet, as "there is no independent cause of action for § 1983 conspiracy," "[w]ithout a viable federal constitutional claim, [a] conspiracy claim under § 1983 necessarily fails." *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016). The claims discussed above, even if they could survive summary judgment, cannot provide a basis for Johnson's conspiracy claim because the asserted deprivations all occurred before defendants supposedly formed their conspiracy. Accordingly, Johnson must show that he has some other viable constitutional claim on which his conspiracy claim can rest.

Johnson argues that defendants' conspiracy deprived him of his constitutional right to seek judicial relief for his injury. The Fourteenth Amendment protects "[t]he right of individuals to pursue legal redress for claims which have a reasonable basis in law and fact." *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). Thus, a plaintiff has a viable claim where he can show that "state action hindered his . . . efforts to pursue a nonfrivolous legal claim and that consequently [he] suffered some actual concrete injury." *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000).

However, Johnson's claim amounts to little more than that perceived deficiencies and omissions in the root cause analysis, records, and report—e.g., failure to sufficiently investigate and accurately explain why he was removed from 1:1—show that defendants' investigation was plainly, even deliberately, deficient. Whether that's true, it's not enough: Johnson "does not have a constitutional right to have [state actors] investigate his case at all, still less to do so to his level of satisfaction." *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015).

That Johnson's case might have "been better" if defendants had conducted a more thorough investigation is insufficient to support a claim for denial of the right to pursue judicial relief. *Id.* Instead, Johnson must show that defendants "prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow [his] right of access" to the courts. *Vasquez*, 60 F.3d at 329. Here, Johnson has not shown that any facts, much less facts crucial to his claims, were kept from him or otherwise concealed. Thus, his claim for denial of access to the courts necessarily fails.

Even if Johnson had a viable underlying constitutional claim, though, his conspiracy claim would still fail because he has not shown "that the defendants

conspired—that is, reached an agreement—with one another." *Ziglar*, 137 S. Ct. at 1868. The only evidence of conspiracy that Johnson offers is Rimmer's deposition testimony that she heard "rumors . . . about a cover-up" by "the supervisors and the nurses." *See* Rimmer Dep., ECF No. 79-5, 30:7–31:5. Rimmer does not identify the source of these rumors, provide any specifics about the supposed cover-up, or so much as hint at the membership of this apparent cabal of supervisors and nurses. Without more, Johnson's conspiracy claim necessarily fails.

No reasonable jury could find that defendants conspired to hide the truth about what happened to Johnson and why or that they prevented him from seeking relief for claims with a reasonable basis in law and fact. Therefore, I will grant their motion for summary judgment on Johnson's claim that they conspired to and did deprive him of his constitutional right of meaningful access to the courts.

### C. Municipal Liability

Finally, Johnson argues that Milwaukee County, DHHS, and MHC are liable under § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for his injuries. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (discussing proper grounds for municipal liability under *Monell*). "But a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010).

As discussed above, not only has Johnson failed to show that a reasonable jury could find any of the individual defendants personally liable under § 1983, he has also failed to show that any municipal employee committed any constitutional violation for

14

Case 2:14-cv-01408-LA   Filed 01/18/18   Page 14 of 16   Document 88

which he could be entitled to relief under § 1983. Accordingly, I must grant defendants' motion for summary judgment on Johnson's § 1983 claims, including his *Monell* claims.

### D. State-Law Claims

Defendants ask that, after granting them summary judgment on Johnson's federal claims, I decline to exercise supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. § 1367(c)(3). "When federal claims drop out of [a] case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012).

"Although the decision is discretionary, '[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims.'" *Id.* at 479 (quoting *Al's Serv. Ctr. v. BP Prod. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010)). "The presumption is rebuttable, 'but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law.'" *Id.* (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996)). Johnson has not rebutted the presumption in favor of declining to exercise federal jurisdiction over his remaining claims.

Further, although "certain circumstances . . . may displace the presumption," *id.* at 480 (listing "case-specific factors," including whether "the statute of limitations has run" or "substantial judicial resources have already been committed" (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009))), defendants argue and Johnson does not dispute that no such circumstances exist here.

15

Case 2:14-cv-01408-LA   Filed 01/18/18   Page 15 of 16   Document 88

Accordingly, I will grant defendants' request and decline to exercise supplemental jurisdiction over Johnson's state-law claims.

### III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that defendants' motion for summary judgment on Johnson's federal claims and request that the court relinquish supplemental jurisdiction over his state-law claims (ECF No. 66) are **GRANTED**. The Clerk of Court shall enter final judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge