In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————

No. 18-1321

LLOYD N. JOHNSON,

*Plaintiff-Appellant*,

*v.*

KAREN RIMMER, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cv-01408-LA — **Lynn Adelman**, *Judge*.

———————

ARGUED FEBRUARY 22, 2019 — DECIDED AUGUST 30, 2019

———————

Before RIPPLE, MANION, and BRENNAN, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Lloyd Johnson brought this action under 42 U.S.C. § 1983 against various employees and officials of the Milwaukee County Medical Health Complex ("MHC"), MHC itself, Milwaukee County, and the County's Department of Health and Human Services. His claims center on an incident of substantial self-mutilation that occurred while he was in the care of MHC. Mr. Johnson alleged that the defendants violated his Fourteenth Amendment rights

by providing constitutionally inadequate medical care, which led to his self-mutilation. Mr. Johnson also brought claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), in which he alleged that the institutional defendants maintained unconstitutional policies, procedures, and customs that caused his injuries. He further maintained that defendants engaged in a conspiracy to cover up the constitutionally inadequate care. In addition to these federal claims, Mr. Johnson brought associated state-law claims.

The defendants moved for summary judgment, and the district court granted the motion in favor of all defendants on all of Mr. Johnson's federal claims. It declined to retain jurisdiction over the state-law claims. Mr. Johnson now brings this appeal, challenging only the district court's decision in favor of two individual defendants: Dr. David Macherey and Nurse Ade George. For reasons set forth in the following opinion, we affirm the judgment of the district court.

# I.

## BACKGROUND

### A.

Mr. Johnson suffers from a variety of mental ailments, including paranoid schizophrenia, major depressive disorder recurrent, obsessive compulsive disorder, and borderline personality disorder. Starting in mid-2011, he had been admitted intermittently to MHC for treatment. During one of these stays, on March 18, 2012, Mr. Johnson substantially harmed himself, leading to this present suit.

The relevant sequence of events began on February 28, 2012, when Mr. Johnson voluntarily admitted himself to

MHC with complaints of depression, delusional thoughts, auditory hallucinations, and suicidal ideations. Mr. Johnson's intake records at that admission reflect that he previously had attempted suicide or self-harm and that he told the intake nurse that "his ears are in the shape that they are in (keloids) because he pulled on his penis in the past and after that, they grew the keloids."[1] He was diagnosed with a psychotic disorder but was released twenty-two hours after admission. MHC discharged Mr. Johnson because his condition had improved; he had asked to be released; and the attending physician had determined there were no grounds to detain him at MHC against his will.

On March 3, 2012, while staying at his stepmother's house, Mr. Johnson used a pair of scissors to sever his testicles, cut off both his earlobes, and remove a portion of skin from his penis. Milwaukee Police took him to Froedtert Hospital for treatment. He remained there until March 8, when he was transferred to MHC pursuant to a petition for emergency detention.[2] At MHC, he was assigned a private bedroom with a private bathroom in the Intensive Treatment Unit ("ITU"), a locked area reserved for the highest-risk patients.[3] Upon admission, he was placed on 1:1 observation

---

[1] R.78-1 at 2. A keloid is a type of raised scar that can occur where the skin has healed after an injury.

[2] *See* Wis. Stat. § 51.15(1)(ar)(4) (providing that the state may take a person into temporary custody if the individual is mentally ill and evinces a substantial probability of physical harm to himself).

[3] All patients and visitors are searched before entering the ITU. They are prohibited from having any sort of sharp objects on their persons while in the ITU.

status, which required that he never be left alone or out of sight of an assigned nurse.[4]

On March 9, Mr. Johnson met with Dr. David Macherey for an incoming assessment. At the time, Dr. Macherey was the psychologist and treatment director in the ITU. He diagnosed Mr. Johnson with bipolar disorder[5] and noted that the most recent episode was mixed,[6] severe, and psychotic. Dr. Macherey concluded that Mr. Johnson's explanations for his self-mutilation were various and delusional. He also determined that Mr. Johnson had auditory hallucinations, difficulty concentrating, poor self-esteem, and impaired judgment. He specifically noted Mr. Johnson's lack of concern about his recent behavior. As a result of these conclusions,

---

[4] This regimen includes when the patient is asleep or using the bathroom. Policies provide that while either a nurse or doctor may initiate 1:1 observation, a physician must review and confirm a nurse-initiated observation. Further, any 1:1 observation must be reevaluated every twenty-four hours to determine whether the heightened observation should continue.

[5] Dr. Macherey described bipolar disorder as

> tend[ing] to follow a pattern where typically a person becomes manic, the mania runs its course, and quite often, without treatment, a person might enter a depressive episode following the mania. And then there can also be periods of fairly stable behavior where the person, for all intents and purposes, doesn't appear to have a mental illness.

R.69-2 at 11–12 (Macherey Dep. 40:18–41:13). He also asserted that, with treatment, people with bipolar disorder could stay stable indefinitely.

[6] A mixed state occurs when a bipolar individual experiences both mania and depression at the same time. Persons in a mixed state are at a higher risk of self-harm. *Id*. at 12 (Macherey Dep. 41:17–42:09).

Dr. Macherey determined that Mr. Johnson was at significant risk of self-harm. He ordered that Mr. Johnson remain on 1:1 observation to ensure against further self-mutilating behavior.

That same day, Dr. Thomas Harding, the Medical Director of MHC, also examined Mr. Johnson. He concurred with Dr. Macherey's assessment and prescribed a variety of drugs to treat Mr. Johnson's mental ailments. Dr. Harding and Dr. Macherey then established a goal for Mr. Johnson to "report freedom from [auditory hallucinations] and demonstrate clear[,] reality[-]based thinking within 7 days."[7]

Later that day, Mr. Johnson found a metal object and inserted the object into his pants. Mr. Johnson could have used this object to harm himself, but the staff quickly noticed his action and took the object from him. Nurse Remedios Azcueta testified that when Mr. Johnson hid the metal object, he said that "he wanted to die" and that "[i]t hurts."[8]

Over the next five days,[9] Mr. Johnson continued to be on the 1:1 observation protocol. He remained in a state of anxiousness, and had disorganized and tangential thoughts, delusions, and auditory hallucinations. Mr. Johnson reported

---

[7] R.78-7 at 1. The defendants assert that this goal referred to conditions that must be met prior to discharge from MHC; Mr. Johnson contends that this goal refers to conditions that must be met before he could be removed from 1:1 observation status.

[8] R.69-6 at 13–14 (Azcueta Dep. 48:11–49:11).

[9] On March 13, the petition for Mr. Johnson's emergency detention was withdrawn, and he signed an agreement voluntarily admitting himself to MHC.

that he did not regret his act of self-harm. Further, although the records indicate that such thoughts became more sporadic over time, Mr. Johnson continued to express that he wished to remove his genitals. For example, on the morning of March 14, he told a nurse that he still wanted to harm himself by removing his genitals and, if he could, he would do it at MHC. That same day, Mr. Johnson reported that his medications were not working.

On March 15, Mr. Johnson's treatment team, which included Dr. Macherey, Dr. Harding, Nurse Mary Holtz, psychiatric social worker Candace Coates, and occupational therapist Sue Erato, met with Mr. Johnson to determine the next steps in his treatment. The record reflects that Mr. Johnson participated cooperatively in this conference, reported that the medication was helping, and indicated that the auditory hallucinations that he had been experiencing had become cloudy and less troublesome. Dr. Harding determined that Mr. Johnson was improving because he articulated a desire for therapy, was able to identify personal strengths and goals, slept better, denied having suicidal thoughts, and was future-oriented. Both physicians, however, noted that Mr. Johnson's thought process still was disorganized. Mr. Johnson's medical records reflect that the treatment goal for "absence of plan for self harm x3 days was extended."[10] Mr. Johnson remained on 1:1 observation following the meeting.

Prior to the March 15 meeting, Nurse Holtz noted during her morning shift that Mr. Johnson continued to have bizarre

---

[10] R.70-8 at 2.

thoughts, although he reported that his ongoing auditory hallucinations had become background noise. She also documented that Mr. Johnson denied having ideations of suicide or self-harm. She noted that Mr. Johnson told her that he could not believe that he had harmed himself on March 3. That night, Nurse Azcueta documented that Mr. Johnson was depressed.[11] She also noted that Mr. Johnson's "thought[s] [we]re improving [with] medications" and that he "stated no thoughts of self[-]harm."[12] Further, her notes reflect that Mr. Johnson interacted with other patients in the ITU and cooperated during his dressing change.

Dr. Macherey next examined Mr. Johnson on March 16.[13] He documented that, although Mr. Johnson remained depressed, his thinking had been organized for almost forty-eight hours and he denied any thoughts of self-harm.[14] Dr. Macherey's notes also reflect that Mr. Johnson still demonstrated loose associations and had not yet met the

---

[11] *See* R.70-12 at 29.

[12] *Id*. at 30; *see also* R.69-6 at 22 (Azcueta Dep. 82:12–83:15).

[13] March 16 was the last day that Dr. Macherey and Dr. Harding saw Mr. Johnson prior to Mr. Johnson's incident of self-mutilation. Citing his medical records, Mr. Johnson notes that no medical doctor saw him over the weekend on March 17 and March 18. Relying on the same records, Mr. Johnson asserts that Dr. Macherey did not provide any instructions for Mr. Johnson's ongoing care and safety during the weekend. The defendants respond that there was an onsite physician who was aware of Mr. Johnson's needs.

[14] Mr. Johnson denies that forty-eight hours had passed since he had any thoughts of self-harm. He calculates the time as closer to thirty-six hours.

treatment plan's goal of showing reality-based thinking for seven days without auditory hallucinations.[15]

During her morning shift that day, Nurse Holtz noted that Mr. Johnson's "thoughts [we]re reality[-]based" and that he "denie[d] any thoughts of self-harm."[16] She also documented that Mr. Johnson was "depressed" about the harm he had done to himself and was "overwhelmed" by his medical problems.[17] Around 3:00 p.m., Dr. Macherey removed Mr. Johnson from 1:1 observation status. He testified that he believed Mr. Johnson's condition was improving because Mr. Johnson was no longer ignoring his medical problems, showed an appreciation for his acts of self-harm, and had stopped expressing an intent to harm himself. Dr. Harding concurred with Dr. Macherey's assessment, and the rest of his treatment team did not object to the decision to remove Mr. Johnson from 1:1 observation.[18]

---

[15] Defendants argue that this seven-day plan reflected goals that must be met prior to discharge from the MHC. *See supra* note 7.

[16] R.70-12 at 32.

[17] *Id*.

[18] Nurse Karen Rimmer testified that, during a debriefing following Mr. Johnson's later act of self-mutilation, she did not agree with the decision to remove Mr. Johnson from 1:1 observation at the time the order was made and that other nurses thought similarly. She further testified that, when she made those statements at the debriefing, a supervisor said that the physicians had concerns about the costs of too many 1:1 observations. Nurse Rimmer was not part of Mr. Johnson's treatment team but was assigned to his 1:1 care at different points. The defendants note that Nurse Rimmer did not work on March 16. Nurse Ade George also testified that it was not normal for patients to be removed from 1:1 observation status on Fridays going into weekends; March 16, 2012 was a Friday.

(continued … )

At MHC, the nursing staff conducted rounds every fifteen minutes to check on the whereabouts and well-being of each patient.[19] Once removed from 1:1 observation, Mr. Johnson was subject to these well-being checks. Further, nurses conducted "change of shift rounds" at the start of

---

( … continued)

Additionally, Dr. Mitchell Dunn, Mr. Johnson's expert, opined that it was "premature" to remove Mr. Johnson from 1:1 observation and that Mr. Johnson should have remained on that level of observation for "another couple of weeks" and not "a matter of a couple of days." R.79-11 at 34, 35 (Dunn Dep. 118:05–07, 120:10–13). Dr. Dunn suggested that

> [t]he fact that Mr. Johnson had already made a significant attempt to cut off his penis and had already cut off his testicles and cut his earlobes indicated a desire and awareness to engage—and a willingness to engage in significant self-harmful behavior that … was not fully appreciated by either Dr. Macherey or Dr. Harding.

*Id.* at 26 (Dunn Dep. 87:12–18). Dr. Dunn noted that Mr. Johnson hurt himself just sixty hours after previously being discharged from MHC following his brief February visit; in Dr. Dunn's opinion, Mr. Johnson's behavior was unpredictable. *Id.* at 27 (Dunn Dep. 89:03–91:10).

The defendants note that Dr. Dunn also testified that removal of a patient from 1:1 observation is a legitimate course of treatment and a matter of clinical judgment, and that there are no established standards in the field of psychiatry for the use of 1:1 observation. Additionally, Dr. Dunn stated that the length of time a patient should be under 1:1 observation varies based on specifics to the patient. Dr. Dunn further noted that 1:1 observation can be harmful to the patient because it is very intrusive. The defendant's expert, Dr. Kenneth Robbins, opined that Dr. Macherey's decision was reasonable.

[19] Additionally, at the relevant time, the ITU was divided into three "zones" for additional monitoring: one nursing staff member continuously roamed two of the zones while a second nurse did the same with the third zone. An additional nurse was assigned to assist the other two.

each shift; the nurses observed the whereabouts and well-being of each patient and checked the safety of each patient room, each bathroom, the common area, the treatment room, and all other areas of the ITU. Also, twice per shift, a staff member conducted environmental rounds, which involved a tour of the entire ITU with an emphasis on finding any safety hazards.[20]

On March 18, Nurse George evaluated Mr. Johnson on her morning shift. She noted that, although he presented a flat affect, he communicated better, continued to express regret for the harm he had caused himself, and denied having any hallucinations or harmful ideations. Sometime before 12:30 p.m., Nurse George changed the dressing on Mr. Johnson's wound.[21] Mr. Johnson testified that she changed his dressing in his bathroom and used bandage scissors to cut the yellow, gauze-like bandages while doing so. Nurse George testified that she changed Mr. Johnson's dressing in the treatment room, that she never used scissors during his treatment, and that she never carried scissors on her person.[22]

---

[20] Mr. Johnson asserts that the nurses did not always conduct their rounds as required by MHC policy.

[21] The time of the chart entry that recorded the dressing change was 12:30 p.m. *See* R.79-12 at 46–47 (George Dep. 45:15–46:17). Consequently, the dressing must have been changed before that time.

[22] In records from an investigation conducted following Mr. Johnson's incident of self-harm, Nurse Steven Ellison recounts that, in an interview on March 28, Nurse George claimed that she changed Mr. Johnson's dressing in the treatment room and did not use scissors because the bandages were precut four-inch by four-inch squares and she could tear

(continued … )

At approximately 4:00 p.m. on March 18, Mr. Johnson approached the nursing station of the ITU. He handed the nursing staff a pair of bandage scissors and towels soaked in blood. He stated, "I cut my dick."[23] His penis was completely severed from his body. Mr. Johnson was rushed to Froedtert Hospital, where his penis was surgically reattached.

In the immediate aftermath of the incident, multiple MHC employees reported that Mr. Johnson said that he found the scissors in his bathroom.[24] He testified that the

---

( … continued)

the tape with her hands. Other nurses testified that the bandages used were precut and that Mr. Johnson's dressing changes did not require scissors.

There is evidence that other nurses carried scissors on their persons and had used scissors during Mr. Johnson's dressing changes on days prior to March 18. At the time, MHC did not have a specific policy regarding the use and inventory of scissors beyond the "safeguards on [sic] a psychiatric hospital." R.69-13 at 5 (Bergersen Dep. 14:20). Additionally, though Nurse George testified that MHC policy required all dressing changes be done in the treatment room, other nurses, including supervisors, testified that dressing changes could be done in either the treatment room or the bathroom.

[23] R.78-4 at 18.

[24] In Nurse Steve Ellison's documentation from his investigation, he recounts his own movements on that day and records that, immediately after the incident, Mr. Johnson told him, "Don't be mad at no body [sic], they didn't give them to me. They were in my room, a bathroom. It was a blessing they were left. I had to do it." R.78-18 at 6. Nurse Suprina Gunn-Hayes, who was with Nurse Ellison at the time, wrote a memo recounting that Mr. Johnson said, "I cut my dick off it had to go, no one gave me the scissors I found them in the bathroom." *Id.* at 8. Nurse Mike

(continued … )

scissors were "[u]nder a pair of dry napkins, like hand towel napkins" in his bathroom and that he harmed himself shortly after finding them.[25] The scissors that he used were metal-handled medical scissors manufactured by a company from which MHC had purchased that type of scissors. In his deposition, Mr. Johnson was unable to identify how the scissors got to the bathroom and how long they had been there.[26]

According to the record evidence, no one saw scissors in Mr. Johnson's bathroom prior to the incident. During the

---

( … continued)

Sonney-Kamanski wrote an email to Jennifer Bergerson, then the director of acute services, around midnight on the day of the incident, recounting that the nursing assistant who had accompanied Mr. Johnson to the hospital reported that "[t]he patient told the ER DOC that he found the scissors in a bathroom." *Id*. at 9. Nurse Azcueta also testified that Mr. Johnson said he had found the scissors in the bathroom; Nurse Azceuta does not recall when Mr. Johnson made this statement. Finally, Dr. Sara Coleman visited Mr. Johnson at Froedtert Hospital on March 19 to determine whether Mr. Johnson should be involuntarily committed to MHC following his physical treatment for his injury. She testified that Mr. Johnson told her that he found the scissors in the bathroom.

[25] R.69-1 at 18 (Johnson Dep. 65:03–09, 66:04–08).

[26] Mr. Johnson testified that he was asleep in his room from about 9:00 or 10:00 a.m. until he woke at about 3:30 or 3:45 p.m. *Id*. at 17 (Johnson Dep. 62:08–64:14). He stated that, when he woke, he cleaned his room, found the scissors, and injured himself. *Id*. at 17–18 (Johnson Dep. 64:18–66:08). Mr. Johnson responded "I don't remember" or "I don't recall" to the following questions: "Were there people that would come and clean your room or your bathroom during the time you were a patient?" *Id*. at 17 (Johnson Dep. 64:01–02); "[D]o you know whether any staff checked in on you while you were sleeping that day?" *Id*. (Johnson Dep. 64:15–16); "And did you see any staff members between when you woke up and when you injured yourself?" *Id*. at 18 (Johnson Dep. 66:01–03).

post-incident investigation, the housekeeping contractor
who cleaned Mr. Johnson's bathroom in the morning of
March 18 reported that he did not observe any unusual
items and that he did not have scissors on his cleaning cart
or on his person.[27] The daily documentation of nurse rounds
"indicates that the bathroom had been checked for safety at 7
AM and at 3 PM on 3/18 as part of the shift to shift
handoff."[28] Nurse Azcueta testified that she checked the
bathroom at the start of the afternoon shift on March 18 and
that she did not find any contraband. The defendants admit,
in their response to Mr. Johnson's proposed findings of fact,
that a nursing assistant conducted a well-being check just
fifteen minutes prior to the incident.[29]

The record contains testimony that Mr. Johnson might
have obtained scissors from somewhere other than his bath-
room. Nurse Karen Rimmer testified that, when Mr. Johnson
returned to MHC, he told her first that he found the scissors
at Froedtert Hospital before he altered his story and said that

---

[27] The contractor also affirmed that the cleaning cart was always within
his control or locked.

[28] R.78-2 at 9. The Root Cause Analysis and Improvement Plan, devel-
oped by MHC following the incident, notes that "interviews with staff …
suggested that while the sheets may be initialed, the checks are not al-
ways done." *Id*. Bergerson testified that this statement referred to finding
that rounds were not done in a standardized way and not that rounds
were not done at all.

[29] Nurse Azcueta testified that she checked the bathroom during the
well-being check in question. Later, she testified that a nursing assistant
might have been the individual who did the well-being check. Nurse
Rimmer testified that such was the case. The nursing assistant was not
deposed.

he had found them in his bathroom.[30] Mr. Johnson testified that he did not remember this conversation.[31] Others stated that rubberized office scissors were kept in an electrical-type box located inside the nurse's office; although the box was inside a locked or otherwise nurse-supervised office, the box itself was unlocked. Nurses also testified that metal-handled medical scissors were kept in a box or drawer in the treatment room. There also is evidence that, beyond patient treatment, the exam room was used at times as an "overflow interview room[], for patient phone calls and for lab draws."[32] MHC staff testified that patients always were supervised while in the treatment room and that the room was locked when not in use. Finally, Nurse Ellison, charged with the initial investigation into the incident, reported that he had observed Mr. Johnson talking to a housekeeping contractor around 1:45 p.m. on March 18.[33] During Nurse Ellison's investigation, this contractor explained that he knew Mr. Johnson, but had not seen him for a few years. The contractor recounted that Mr. Johnson "was smiling" and said,

---

[30] *See* R.69-10 at 8 (Rimmer Dep. 27:04–06). Nurse Rimmer also testified that she had been told that Mr. Johnson went to Froedtert Hospital at some point prior to March 18. According to the Root Cause Analysis and Improvement Plan, "[t]he patient did not leave the unit during his stay." R.78-2 at 8. Nurse Azcueta testified that Mr. Johnson had an appointment scheduled on March 12 but that the appointment was rescheduled to March 19.

[31] *See* R.69-1 at 19 (Johnson Dep. 72:04–07).

[32] R.78-2 at 9.

[33] The housekeeping contractor estimated this conversation occurred at 3:00 p.m.

"I have to tell you something," but that the contractor told him he could not talk at that time.[34] According to the contractor, the exchange lasted no more than five minutes. MHC's entire investigation into the incident was unable to determine the source of the scissors.

## B.

On November 5, 2014, Mr. Johnson brought this action against the MHC, its employees and officials, Milwaukee County, and the Milwaukee County Department of Health and Human Services seeking damages for the injuries he suffered while in the care of MHC. In the first of his two federal claims under 42 U.S.C. § 1983, Mr. Johnson alleged that the defendants' inadequate medical care deprived him of his right to substantive due process. According to Mr. Johnson, the defendants' care was constitutionally inadequate because removing him from 1:1 observation status and allowing him to possess scissors created the circumstances that permitted him to injure himself. Second, relying on *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Mr. Johnson alleged that MHC, Milwaukee County, and its Department of Health and Human Services maintained unconstitutional policies, procedures, and customs that had caused his injuries. Relatedly, Mr. Johnson claimed that the defendants conspired to cover up their constitutionally inadequate care. Mr. Johnson also brought state-law claims arising out of the same event.

In due course, the defendants moved for summary judgment. They contended that, because Mr. Johnson volun-

---

[34] R.78-18 at 10.

tarily had committed himself to MHC, he had no substantive due process rights under the Fourteenth Amendment. Moreover, they continued, any such claims failed on the merits. Removing Mr. Johnson from 1:1 observation, they submitted, was simply a matter of professional judgment. Under our decision in *Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998), they submitted, removing him from such close observation was not such a serious departure from accepted practice as to constitute a constitutional deprivation. With respect to access to the scissors, the defendants contended that Mr. Johnson could not "cite to any evidence to suggest that the scissors he used to sever his penis were deliberately left for him to find."[35] Consequently, they argued, he was "left with nothing more than a claim that the scissors were accidentally or inadvertently left behind," and "inadvertence [wa]s insufficient to sustain a § 1983 claim."[36]

In his opposition to the motion for summary judgment, Mr. Johnson contended that there was sufficient evidence to permit a jury to conclude that, by removing him from 1:1 observation, the defendants were deliberately indifferent to his serious medical condition. With respect to access to the scissors, Mr. Johnson contended that he was "entitled to the reasonable inference that *a* nurse left her bandage scissors in his bathroom."[37] "At a minimum," Mr. Johnson continued, "there [wa]s a reasonable inference … that the *three* nurses identified as conducting bandage changes in [his] room,

---

[35] R.67 at 15.

[36] *Id.*

[37] R.76 at 19 (emphasis added) (capitalization and bold removed).

No. 18-1321    17

George, Azcueta and Plum were deliberately indifferent or recklessly disregarded [his] needs."[38] Other than noting that Nurse George's bandage change was closest in time to his incident of self-harm, Mr. Johnson did not suggest how a jury might conclude that it was more likely than not that *a particular nurse* left the scissors in the bathroom.

The district court granted the defendants' motion. It held that Mr. Johnson could not sustain his claim regarding his removal from 1:1 care because no jury could find, on the record made by the parties, that the medical staff's decision was a substantial departure from accepted professional norms. The court concluded that, at most, the facts showed that removing Mr. Johnson from 1:1 care was negligent, and mere negligence is not sufficient to sustain a constitutional claim. The district court also held that Mr. Johnson could not go forward with his claim that the defendants deprived him of substantive due process by exposing him to the scissors. It reasoned that mistakenly leaving scissors in the bathroom was only negligence. The court also noted that, regardless, Mr. Johnson failed to submit sufficient proof that any individual defendant was personally responsible for the scissors ending up in his possession.[39]

The district court also rejected Mr. Johnson's *Monell* claim and conspiracy claim. With no other federal claims remaining, the district court declined to exercise supplemental ju-

---

[38] *Id*. at 21 (emphasis added).

[39] Because the district court found there was no violation of Mr. Johnson's rights, it did not address whether he had substantive due process rights as a voluntarily admitted patient in the first place.

risdiction over Mr. Johnson's state-law claims. Mr. Johnson timely appealed. He only challenges the district court's decision in favor of two individual defendants: Dr. David Macherey and Nurse Ade George.

## II.

### DISCUSSION

We review the district court's decision on summary judgment de novo. *E.T. Prods., LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 467 (7th Cir. 2017). Summary judgment is proper when the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (internal quotation marks omitted). "[A] court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, we, like the district court, view the record in the light most favorable to the nonmoving party. *Id*. However, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody*, 893 F.3d at 401 (internal quotation marks omitted).

## A.

Before we address the merits of Mr. Johnson's specific substantive due process claims,[40] we first outline the general contours of the constitutional protections he asserts. In *DeShaney v. Winnebago County Social Services Department*, 489 U.S. 189 (1989), the Supreme Court determined that the Due Process Clause of the Fourteenth Amendment "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. "[N]othing in the language of the Due Process Clause," said the Court, "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. Instead, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.*

*DeShaney* does note, however, that "in certain limited circumstances[,] the Constitution imposes upon the State af-

---

[40] In his reply brief, Mr. Johnson argues that the State violated his rights to procedural due process because it did not follow its procedures when committing him. Mr. Johnson forfeited this argument by raising it for the first time on appeal and in his reply brief. *See Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013) ("[A] party may not raise an issue for the first time on appeal.") (quoting *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010)). Mr. Johnson's attempt to shoehorn this argument into the voluntariness analysis, *see* Reply Br. 2 ("Johnson's confinement was not voluntary because he was denied all procedural due process rights" (bold omitted)), does not affect the result: as discussed above, the voluntary nature of Mr. Johnson's commitment is not a question we need to decide.

firmative duties of care and protection with respect to par-
ticular individuals." *Id.* at 198. First, due process rights arise
when there is a special relationship between the government
and the individual. Second, the state is constitutionally obli-
gated to provide aid where it has created the danger.
Mr. Johnson submits that both exceptions apply. He con-
tends that Dr. Macherey and Nurse George can be liable un-
der the special relationship exception because he was "not
free to leave MHC's custody."[41] Moreover, he argues that
Nurse George affirmatively placed him in a danger he oth-
erwise would not have faced.

## 1.

"When a state actor … deprives a person of his ability to
care for himself by incarcerating him, detaining him, or in-
voluntarily committing him, it assumes an obligation to pro-
vide some minimum level of well-being and safety." *Col-
lignon v. Milwaukee Cty.*, 163 F.3d 982, 987 (7th Cir. 1998) (ci-
tations omitted). This obligation includes meeting the per-
son's medical needs while he is in custody. *Id.* at 988–89.

To determine whether the state provided adequate care,
the Supreme Court requires that we "make certain that pro-
fessional judgment in fact was exercised." *Youngberg v. Ro-
meo*, 457 U.S. 307, 321 (1982) (internal quotation marks omit-
ted). This review is deferential: a professional's decision[42] "is

---

[41] Appellant's Br. 34.

[42] The Court defined a professional as "a person competent, whether by
education, training or experience, to make the particular decision at is-
sue" and contemplated that someone with a degree in medicine or nurs-
ing was such a person in the case of treatment decisions. *Youngberg v.
Romeo*, 457 U.S. 307, 323 n.30 (1982).

presumptively valid" and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

In a medical context, the *Youngberg* professional judgment standard first requires that the plaintiff show that his medical need was objectively serious. *Collignon*, 163 F.3d at 989. Then, the plaintiff must prove that the treatment decision was a *substantial* departure from the accepted professional standard.[43] *Id.* A plaintiff does so by establishing "(1) that the professional knew of the serious medical need, and (2) disregarded that need." *Id.* Knowledge can be proved if the trier of fact can conclude the plaintiff's medical need was "obvious." *Id.* Disregard of that need can be proved "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is,

---

[43] Mr. Johnson submits that the professional judgment standard "requires a showing of something more than negligent wrongdoing but something less than intentional wrongdoing—something akin to criminal recklessness." Appellant's Br. 31. Although we have used this language when describing the deliberate indifference standard, *see Collignon*, 163 F.3d at 988, determining that Dr. Macherey or Nurse George violated Mr. Johnson's substantive due process rights requires the more specific professional judgment standard, which applies to professionals like "physicians, psychiatrists, and nurses within their area of professional expertise." *Id.* at 989. We have been clear that this standard asks whether the medical professional substantially departed from accepted professional standards. *See King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012).

that no minimally competent professional would have so responded under those circumstances." *Id*.[44]

### 2.

The state-created danger exception to the rule in *DeShaney* is also well established.

---

[44] Dr. Macherey and Nurse George argue that we need not consider whether the evidence establishes the special relationship exception to *DeShaney*'s general rule. According to Dr. Macherey and Nurse George, Mr. Johnson voluntarily committed himself to MHC and, therefore, the special relationship exception is inapplicable here. Courts generally agree that individuals who voluntarily admit themselves to a state-run mental health facility do not have substantive due process rights simply because they are in the state's custody. *See, e.g.*, *Campbell v. State of Washington DSHS*, 671 F.3d 837, 843 (9th Cir. 2011) ("Mere custody, however, will not support a special relationship claim where a person *voluntarily resides* in a state facility under its custodial rules." (internal quotation marks omitted)); *Torisky v. Schweiker*, 446 F.3d 438, 446 (3d Cir. 2006) ("[A] custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger the protections of *Youngberg*."); *Brooks v. Giuliani*, 84 F.3d 1454, 1466–67 (2d Cir. 1996) (holding there was no "duty to exercise professional judgment" because the plaintiffs were not under a "state-imposed restraint" (internal quotation marks omitted)).

We have not addressed directly the extent to which the voluntariness of one's committal to the state's custody bears on due process rights under *DeShaney*. Like the district court, we do not need to determine whether a voluntary commitment can be de facto involuntary for the purposes of the Due Process Clause or whether Mr. Johnson's commitment was functionally involuntary. As we will discuss later, even if Mr. Johnson has due process rights under the special relationship exception, he cannot show that Dr. Macherey and Nurse George deprived him of those rights.

We have established a three-part test for such claims. *King ex. rel King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007).[45] First, "the state, by its affirmative acts, must create or increase a danger faced by an individual." *Id.* at 818. Second, "the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual." *Id.* Third, "the state's failure to protect the individual must shock the conscience." *Id.* "Only 'the most egregious official conduct' will satisfy this stringent inquiry. Making a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654–55 (7th Cir. 2011) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) (citation omitted). Unlike the special relationship exception, custody or lack thereof plays no role in the state-created danger analysis. *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 708 (7th Cir. 2002).

## B.

Turning to Mr. Johnson's claims against Dr. Macherey, Mr. Johnson contends that Dr. Macherey provided inadequate medical care, in violation of his due process rights, by

---

[45] In *King ex. rel King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 n.3 (7th Cir. 2007), we noted that the circuits apply the state-created danger doctrine differently. We determined that the variations among the circuits did not "reflect fundamental doctrinal differences" because all approaches limit liability to "conduct that violates an individual's substantive due process rights" by being "arbitrary in the constitutional sense, i.e., shocks the conscience." *Id.*

removing him from 1:1 observation status. Analyzed under either of the exceptions to the *DeShaney* rule, our inquiry is basically the same: whether Dr. Macherey knew that Mr. Johnson suffered from an objectively serious condition and whether Dr. Macherey responded to that knowledge in a way "no minimally competent" medical professional "would have so responded under those circumstances." *Collignon*, 163 F.3d at 989 (reviewing actions under professional judgment exception); *Jackson*, 653 F.3d at 654–55 (observing that a "bad decision" does not suffice to show a state-created danger; instead, when "public officials have time for reasoned deliberation in their decisions, the officials' conduct will only be deemed conscience shocking when it 'evinces a deliberate indifference to the rights of the individual'" (quoting *King ex rel. King*, 496 F.3d at 819)).[46] No one disputes that Mr. Johnson's medical condition was objectively serious or that Dr. Macherey knew of Mr. Johnson's condition. Thus, we focus on whether no minimally competent medical professional would have removed Mr. Johnson from 1:1 care. We conclude that no reasonable fact finder could find that Dr. Macherey's decision was outside the bounds of a competent medical professional's judgment.

Mr. Johnson points to several facts that, in his view, would support a jury's determination that Dr. Macherey failed to exercise the constitutionally required level of professional judgment. First, Mr. Johnson expressed his wish to

---

[46] *See* Appellant's Br. 30 (noting that "[u]nder either standard, a claim against a health care provider acting within his or her area of expertise requires a showing that the provider failed to exercise 'professional judgment'" and citing *Collignon*).

No. 18-1321                                                    25

harm himself at least six to eight times while at MHC, in-
cluding two days prior to his removal from 1:1 observation.
Second, on the day after his arrival at MHC, Mr. Johnson
managed to find a metal object and briefly insert it into his
pants, stating that "he wanted to die" and that "[i]t hurts."[47]
Third, at the time he was removed from 1:1 care, Mr. John-
son's nurses documented that he was depressed, was over-
whelmed, and still demonstrated loose associations. Similar-
ly, Mr. Johnson had not yet met his treatment plan's goal of
showing reality-based thinking without auditory hallucina-
tions when he was removed from 1:1 care. Fourth, one of
Mr. Johnson's caregivers at MHC, Nurse Rimmer, testified
that she disagreed with the decision to remove Mr. Johnson
from 1:1 care but was not asked her opinion prior to the de-
cision. Likewise, Mr. Johnson's expert opined that it was
"premature" to remove Mr. Johnson from 1:1 observation
and that Mr. Johnson should have remained on that status
for "another couple of weeks" and not a "matter of a couple
of days."[48] Fifth, Nurse Rimmer testified that, after the inci-
dent, one of her supervisors said that the physicians had
concerns about the cost of 1:1 observations.[49] Sixth, Dr. Ma-

---

[47] R.69-6 at 14 (Azcueta Dep. 48:11–49:11).

[48] R.79-11 at 34–35 (Dunn Dep. 118:05–07, 120:10–13).

[49] This is an out of court statement offered for the truth of the matter as-
serted. We do not need to determine whether it falls outside of the defi-
nition of hearsay or within an exception to the hearsay rule because,
even accepting that costs were a consideration, Mr. Johnson cannot show
that no minimally competent medical professional would have removed
him from 1:1 care. *See Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016)
(noting that "cost of treatment is a factor in determining what constitutes
adequate, minimum-level care" as long as medical personnel do not

(continued … )

cherey described in his own testimony that people with bi-
polar disorder can have periods of fairly stable behavior. Fi-
nally, Mr. Johnson first harmed himself just sixty hours after
being discharged from his prior voluntary stay at MHC in
February.

We must assess the record in the light most favorable to
Mr. Johnson, the nonmovant. We therefore accept the facts
proffered by Mr. Johnson and make all reasonable inferences
from those facts. But we do not ignore the other evidence
suggesting that at least some minimally competent doctors
would have, like Dr. Macherey, removed Mr. Johnson from
1:1 observation status. Over the course of his care at MHC,
Mr. Johnson underwent frequent assessments, and his medi-
cal team noted several facts indicating an improving condi-
tion, including that (1) after stating that he still wished to
remove his genitals on the morning of March 14, Mr. John-
son stopped mentioning that he intended to harm himself
and denied, on multiple occasions to different MHC staff,
that he had any harmful ideations; (2) during a March 15
treatment meeting with his treatment team, Mr. Johnson was
cooperative, articulated a desire for therapy, was future-
oriented, exhibited organized thinking, and identified per-
sonal strengths and goals; (3) starting on March 15,
Mr. Johnson reported multiple times that his hallucinations
were becoming cloudy and less troublesome; (4) on the night
of March 15, Mr. Johnson reported that his medications were
working; (5) on the day he was removed from 1:1 care,

---

( … continued)
"simply resort to an easier course of treatment that they know is ineffec-
tive").

No. 18-1321                                                      27

March 16, Mr. Johnson had denied any ideations of self-harm for almost two days; (6) over time, Mr. Johnson began to show a brighter affect and engage positively with other patients in the unit; and (7) Mr. Johnson had started sleeping better and eating more.

Dr. Macherey, moreover, did not make the decision to remove Mr. Johnson from 1:1 observation unilaterally; Dr. Harding concurred with Dr. Macherey's assessment that Mr. Johnson had improved enough to be removed from 1:1 observation and other members of Mr. Johnson's treatment team did not object to Dr. Macherey's decision. Mr. Johnson's own expert, despite his ultimate conclusion that removing Mr. Johnson from 1:1 care was premature, also testified that the intrusive nature of 1:1 observation can be harmful to the patient, that there are no established standards in the field of psychiatry for the use of 1:1 observation, and that removing a person from 1:1 care is a legitimate course of treatment. Finally, Dr. Macherey's expert opined that the decision to remove Mr. Johnson from 1:1 care was reasonable.

Dr. Macherey testified that he believed that Mr. Johnson's condition had improved sufficiently to justify his removal from 1:1 observation. Specifically, Dr. Macherey noted that Mr. Johnson was no longer ignoring his medical problems, that he had showed an appreciation for his prior actions, and that he had stopped expressing an intent to harm himself.

Considering Mr. Johnson's documented improvement, the consensus of his treatment team that removing him from 1:1 observation was appropriate, and the recognition that, at some point, 1:1 care is too restrictive for the patient, a reasonable factfinder could not find that *no minimally competent*

doctor would have made the same decision. As we have said, "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). We make no determination as to whether Dr. Macherey was negligent; the Due Process Clause requires that Mr. Johnson demonstrate a more egregious lapse of professional performance. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Jackson*, 653 F.3d at 654–55. The district court correctly granted summary judgment in favor of Dr. Macherey on Mr. Johnson's constitutional claim.

## C.

We next examine Mr. Johnson's constitutional claim against Nurse George. He submits two theories of liability. First, he argues that Nurse George violated his due process rights by providing inadequate medical care. Second, he contends that Nurse George affirmatively placed him in a position of danger in which he otherwise would not have been.[50] Both theories require, in the end, that Mr. Johnson establish that Nurse George left the scissors used by Mr. Johnson to harm himself in his bathroom, despite her being aware of the specific risks that sharp objects posed to him. However, *on the basis of the record made in the district court*, no reasonable factfinder could determine that Nurse

---

[50] Mr. Johnson did not make this argument before the district court. The defendants, however, do not argue that Mr. Johnson forfeited his state-created danger theory by failing to raise it in the district court. Further, they have fully briefed the issue before us and presented defenses at oral argument. Consequently, we will address the argument on appeal.

George, as opposed to another treating nurse, left the scissors that Mr. Johnson eventually used.

In an action under § 1983, the plaintiff must establish individual liability. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017). Thus, Mr. Johnson must be able to establish Nurse George's "*personal involvement* in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Before the district court, however, Mr. Johnson did not argue that there was sufficient evidence from which a jury could conclude by a preponderance of the evidence that Nurse George was the nurse who left the scissors in his bathroom. Rather, he simply argued that the district court should make a "reasonable inference that *a* nurse left her bandage scissors in his bathroom" and maintained, simultaneously, that Nurse George *or* Nurse Azcueta *or* Nurse Plum left the scissors.[51] Mr. Johnson did not point to any evidence that would allow the jury to winnow the field from three to one, nor did he otherwise explain how a jury could choose from among these three possible tortfeasors. We agree with the district court's conclusion: the fact "[t]hat one of three individuals (only two of whom are defendants) may have left scissors in Johnson's bathroom is not enough to establish individual liability."[52]

Mr. Johnson did not submit sufficient evidence to establish that a jury could find by a preponderance of the evidence that Nurse George left scissors in his bathroom. Accordingly, we must affirm the grant of summary judgment.

---

[51] R.76 at 18, 20 (emphasis added) (capitalization and bold removed).

[52] R.88 at 9–10.

No. 18-1321

## Conclusion

The district court correctly granted the defendants' motion for summary judgment. Its judgment is therefore affirmed.

AFFIRMED

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

**FINAL JUDGMENT**

August 30, 2019

Before:       KENNETH F. RIPPLE, Circuit Judge
              DANIEL A. MANION, Circuit Judge
              MICHAEL B. BRENNAN, Circuit Judge

| No. 18-1321 | LLOYD N. JOHNSON, Plaintiff - Appellant |
| | v. |
| | KAREN RIMMER, et. al., Defendants - Appellees |

| **Originating Case Information:** |
| District Court No: 2:14-cv-01408-LA |
| Eastern District of Wisconsin |
| District Judge Lynn Adelman |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## BILL OF COSTS

September 30, 2019

Taxed in Favor of: **Appellees; Remedics Azecuta, Thomas Harding, David Machery, Karen Rimmer, Tony Thrasher**

| No. 18-1321 | LLOYD N. JOHNSON,<br>Plaintiff - Appellant<br><br>v.<br><br>KAREN RIMMER, et. al.,<br> Defendants - Appellees |
|---|---|
| **Originating Case Information:** | |
| District Court No: 2:14-cv-01408-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |

The mandate or agency closing letter issued in this cause on September 30, 2019.

BILL OF COSTS issued in the amount of: $188.93.

|  |  | Cost of<br>Each Item | Total Cost<br>Each Item |
|---|---|---|---|
| 1. | For docketing a case on appeal or review or docketing any other proceeding: | | |
| 2. | For reproduction of any record or paper, per page: | | |
| 3. | For reproduction of briefs: | | $188.93 |
| | | TOTAL: | $188.93 |

form name: **c7_BillOfCosts**(form ID: **140**)



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

September 30, 2019

To:     Stephen C. Dries
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

| No. 18-1321 | LLOYD N. JOHNSON,<br>Plaintiff - Appellant<br><br>v.<br><br>KAREN RIMMER, et. al.,<br> Defendants - Appellees |
|---|---|
| **Originating Case Information:** | |
| District Court No: 2:14-cv-01408-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

AMOUNT OF BILL OF COSTS (do not include the $):          188.93

DATE OF MANDATE OR AGENCY CLOSING LETTER ISSUANCE:          09/30/2019

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                              **Received by:**

09/30/2019                                        /s/ D. LaBrie

_____                    _____

form name: **c7_Mandate**(form ID: **135**)